We will hear argument this morning in case number 19-1257, Brnovich v. Democratic National Committee and the consolidated case. Mr. Carbon. Mr. Chief Justice, and may it please the court, I think the key conceptual point here to understand is that Arizona has not denied anyone any voting opportunity of any kind. It's not like a literacy test which denies you the right to vote. It's not like vote dilution where white block voting denies minorities an equal opportunity to elect. Everyone here is eligible and registered to vote. All they have to do is utilize the myriad opportunities that Arizona has offered them over 27 days to vote by mail for free or in person. And since there's no denial of opportunities, this is a disparate impact claim that would not even be cognizable in other contexts. Under Title VII, disparate impact relates to a denial of an employment opportunity, a job or promotion. It doesn't get involved in the process. No one's ever brought a Title VII claim saying you can't require people to send in applications because minorities have less access to transportation and mail, analogous to the claim being made here. So respondents are trying to move disparate impact into an entirely different context. Since there's no denial of any voting opportunity in this context, the circumstances in which time, place and manner rules can violate Section II are extraordinarily limited. They only occur if the state has organized the time, place and manner rules and stacked them in such a way that minorities have less opportunity than non-minorities to cast their votes. That comes directly from the plain language of Section II and it's also, of course, as a practical matter, the only circumstance in which the state has erected any kind of cognizable barrier to minority voting. Respondents' alternative view is at war with the text of Section II. Section II says, again, voting practices cannot provide less opportunity. They say that voting practices which provide the same opportunity are nonetheless unlawful if external socioeconomic factors somehow contribute to disproportionate utilization. But that language is nowhere in the text and was never even mentioned in the legislative history, which is quite laudable. Mr. Carbon, as I understand your test as you've just articulated it, it reduces to anything dealing with time, place or manner. It's an intent test rather than a results test that's provided under Section II. In other words, so long as it's a time, place or manner restriction, it's only when there's a difference between minority voters and white voters that you have a problem. Is that not true? Not entirely, Mr. Chief Justice, for this reason. It does involve differential systems, unequal access. But regardless of whether or not that unequal access is racially motivated, you would not have to prove that the intent behind the differential access provided to minorities was to suppress or hinder the minority vote. And that's a key distinction from Mobile v. Bolden. You talk about the concern being that the analysis would be driven to racial proportionality under the respondent's approach. Now, I understand the concerns about that when you're talking about districting. But why is that a bad thing when you're talking about electoral procedures? Well, what it means is that any neutral system must be changed in order to maximize minority voting strength, regardless of how strong the justification is. Things that provide no unfairness at all to minorities, you must rejigger every aspect of the time, place and manner from registration to election day to early voting in order to maximize minorities' participation. Why is that bad? Because it's the same kind of race-conscious activity of subordinating... Is it maximizing participation or equalizing it? In other words, that only comes up when you have disparate results. And why should there be disparate results if you can avoid them? Well, for example, because it would eliminate all the valuable anti-fraud concerns implicated in the ban on ballot harvesting. And because it would substitute the federal courts, the state legislatures to make these rules. The question is not what's wrong with it. The question is why a system that imposes no unfairness on the group should nonetheless be changed simply because they find a different method of voting more convenient. Justice Thomas? There's no reason to say that simply because... Justice... I apologize. Justice Thomas? Thank you, Mr. Chief Justice. Mr. Carvin, I understand your race neutrality argument. And normally you see that in the context of a non-discrimination statute or 14th Amendment that really requires equal treatment. How does that race neutrality approach fit within the language of the Voting Rights Act that doesn't speak in those terms? But, Justice Thomas, I think it speaks precisely in those terms. It says that a voting practice cannot result in minorities having less opportunity than non-minorities. It says the system needs to be equally open. So what it's saying is as long as everyone has the same opportunity and the system is equally open, Section 2 does not condemn it. The respondents, however, would say that even if minorities are given precisely the same opportunity, unless they utilize it proportionally, then somehow that comes within the constraints of Section 2. But, again, there's nothing in the text of Section 2 which says you need to expand time, place, and manner restrictions to enhance proportionality or maximization. Indeed, if that had been the rule, in 1982 virtually every time, place, and manner restriction in the country would have been illegal overnight because there was severe disproportionate utilization and socioeconomic disparities were ubiquitous. And surely if Congress had intended that kind of sea change, it would have given some hint of it in the legislative history. So this rule is both contrary to the text of Section 2 and any other formulation of what Congress was intending. So is there a causation standard implicit in your neutrality argument? Well, only in the sense that result obviously connotes causation, right? And the question is what can you not cause? What is the prohibited result? And the plain language of Section 2 tells you what the system can't result in is providing less opportunity to minorities. It doesn't say it can't result in providing them the same opportunity, but for whatever reason they don't utilize it to the same extent. So there is a causation question, but the question is what can the state not cause? We say it can't cause less opportunity. The other side says it can't do anything that results in disproportionate outcomes. And how much less opportunity did Ninth Circuit speak in terms of de minimis language? And then the, of course, Judge Scanlon talks more in the language of substantial. How much less opportunity? Well, again, it depends what you're talking about, Justice Thomas. If you're talking about disproportionate outcomes, we don't think that's the issue. So we don't think a severely disproportionate outcome jeopardizes Section 2 viability, nor does a minor disproportionate outcome. The question is not the outcome. The question is the opportunity. And if the state has provided everyone the same opportunity. Now, I will agree with the Attorney General, however, if you get past that, then obviously there needs to be something substantial for two reasons. No one requires perfect. I'm out of time. I'm sorry to cut you off, Mr. Garvin. Justice Breyer? I have two questions. One question is a literacy test, does that provide people the same opportunity? No. By definition, a literacy test doesn't. And so how do we know whether the test, the OOP and the other, whether they do or they don't? I think there's an obvious distinction. I apologize. I thought that it was a measure, a way of finding out if it's the same opportunity or not, to see if minority people use it equally. If they don't use it equally, well, it doesn't prove it. But it might be that the rule that prevents them from using it equally results in an abridgment on account of race. Right. And that's the key point. The literacy test denies you the opportunity to vote. It says you can't vote. Go to the polls, they won't let you vote. Nothing like that is going on here. Everyone has a complete opportunity to vote. The state has not erected any barrier. If the state denies you an opportunity, like under Title VII, it denies you a job. I have another more, I think, a more important question. What would you think of Professor Stephanopoulos' tests, basically, or standards, which bring in from Title VI, Title VII, the Housing Act, the ADA, you know, it uses roughly the same approach. And there would be an opportunity for the state to say, we have a good non-race-related reason for doing this. And, therefore, whatever result is, fewer minorities use it, but it's not on account of race. It's on account of our good reason. Now, that's what we have in all these other statutes, something like that. What would you think of just taking forms of those rules and using them here? Yes, well, two points. One is, of course, there's nothing in the language of Section II which allows you to justify a discriminatory result based on the strength of— In other words, on account of race. Right. If the reason you are doing it is because you have the most wonderful non-race-related reason in the world for doing this, then it is not on account of race. Right. On account of race, as you know, generally, and under jingles means because of race. And the results test means it doesn't have to be on account of potential discrimination. In terms of reading in a justification, obviously that would make the proportionality mandate somewhat less inflexible, but, again, even if you could read it into the statute, you would nonetheless be subjecting the policy judgments of state legislatures to some ad hoc determinations of the sort that was engaged in by the en banc court, where they can find simple things like out-of-precinct voting and ballot harvesting bans to somehow be unjustified. And even under the totality of circumstances and vote dilution, the tenuousness of the policy is only the ninth of the factors. And so I don't understand why, if the statute had actually prohibited, as respondents said, any kind of disparate outcomes, why we would allow the state to get away with that. Justice Alito? Mr. Carvin, you argue that one benchmark for evaluating whether members of a protected class have less opportunity to participate is what we refer to in Crawford as, quote, the usual burdens of voting. What does that mean? What are the usual burdens of voting? Are they the burdens as they existed in 1982? Do they change? How do we determine what they are? I think what they mean is what the court meant in Crawford, which is what we all understand to be the usual burdens of voting. You make a very good point about 1982. We know that needs to be the benchmark for the usual burdens, because otherwise that meant Congress in 1982 was invalidating virtually every time, place, and manner of restriction. So that needs to be, if you will, the safe harbor. The only point we're making is Section 2 did not immunize minorities from the usual burdens of voting. It didn't say you don't have to show up at the right precinct and those sorts of things. And there's nothing in the language of Section 2 which somehow exempts them from doing so. So as long as it's roughly commensurate with the normal election day system that exists, that would constitute the usual burden of voting. Now, this relates to what you were just discussing with Justice Breyer. Your approach differs a bit from that of the Attorney General and the Solicitor General's brief in that I don't understand you to argue that a consideration of the strength of the state's interest for a voting practice has a role to play here. Is that a correct understanding of your position? And if so, why isn't that a legitimate consideration? Your Honor, I would love it if the state could justify its systems if you're going to impose on them some kind of proportionality mandate. Our basic point is it's not a proportionality mandate and their justification should not be an affirmative defense to that. If you want to read that into the statute, that would make it better than a straight proportionality mandate. I will emphasize again that even under the Houston Lawyers Association, which the Solicitor General puts forward, the justification is merely one factor out of the nine to be considered. So that means you're now into this amorphous nine Senate report factors where every district court and appellate court can do its own kind of balancing test, which will lead to all sorts of ad hoc results and not give you the kind of clarity and guidance that state legislatures need prior to Election Day. Thank you. Justice Sotomayor? Counsel, you keep talking about equal opportunity, but I don't see it anywhere in the statute. Aren't you rewriting Section 2? You keep saying repeatedly that it prohibits giving or providing an unequal opportunity to vote. But the language is very clear. It focuses on the effects of government action, not the government action in a vacuum. It says no voting qualification or practice can, quote, result in a denial or abridgment of the right to vote on account of race. So where do you get equal opportunity from in that language? In two places. One is it's not a denial in a time, place, and manner. Excuse me. I think if you can't vote because you are a Native American or a non-Hispanic in areas where car ownership rates are very small, where you don't have mail pickup or mail delivery, where your post office is at the edge of town, and so that you require either a relative to pick up your mail, or a relative to pick up your mail. Or you happen to vote in the wrong precinct because your particular area has a confusion of precinct assignments. If you just can't vote for those reasons and your vote is not being counted, you've been denied the right to vote, haven't you? I don't think anyone would say you've been denied a due process right to a hearing. This is not a due process claim. I'm trying to get the distinction between denial and... Well, no. You're denied something if you're not given the right to vote because or results in your denial from circumstances that the state could remedy easily. Well, again, the only way they could remedy it is to engage in the counterintuitive policies, allowing everybody to vote in any precinct they want, or to have partisan operatives collect their ballots in a real threat to court. But I'm sorry. That's a Hobson's choice that... I have to say that if you look at the district court's findings, which in the end it voted on your behalf, but the district court found no meaningful threat that ballot collection leads to fraud. It found no meaningful threat whatsoever. Perceived threat, but none. And with respect to voting out of precinct, there was no finding by the district court that the ballots couldn't be easily counted. The only way they could be counted is by defeating the entire purpose of the precinct system, which is to have a uniform ballot so you don't need to create these extra post-election remedies to figure out which offices are valid and which are not. So it would be an enormous... Counsel, your state counts out of precinct ballot type things very easily. Well, actually not... It has a whole mechanism in place, according to the district court. Well, what the district court said, what the Ninth Circuit said, was the precinct system served very valuable purposes. And if the precinct system serves valuable purposes, then enforcing the precinct system must necessarily serve those precinct systems. Justice Kagan? Justice Kagan? Mr. Carvin, I have a number of hypotheticals for you, and I'd be grateful if we could run through these fairly quickly just so I can get an understanding of your position. So the first one is that the state decides that each county can have one poll in place. And because of who lives in larger counties, that creates a disparate impact that black voters have to wait in line for 10 times the amount that white voters do, two and a half hours instead of 15 minutes. Is that system equally open in the language of the statute? I would say not. Equally open means takes into account demographic realities. If you have one polling place for five people and one polling place for five million people, obviously in the latter situation, those people do not have an equal opportunity to vote. Okay. How about this one? That's helpful. That's helpful, Mr. Carvin. A state has long had two weeks of early voting, and then the state decides that it's going to get rid of Sunday voting on those two weeks, leave everything else in place. Black voters vote on Sunday 10 times more than white voters. Is that system equally open? I would think it would be, because let's think about it. Sunday is the day that we traditionally close government offices. It would be the exception rather than the rule to have government workers come in on Sunday. It's an exception to have government workers come in on a Saturday, too. That's not a real problem. Well, I mean, there are Sunday closing laws, as we know from McGowan v. Maryland, which are different than Saturday. But in all events, Saturday would implicate other religions. Okay. So that's equally open. Thank you, Mr. Carvin. Can we just go on to another one? The state says, we're placing all our polling places at country clubs. And that decision means that black voters have to drive 10 times as long to the polls and have to go into places which are traditionally hostile to them. Yeah, I would think that would provide them with less opportunity than non-minorities. And why is that? Well, because they have to travel further into hostile territory where non-minorities can travel one block to very sympathetic. Okay, that's helpful. The state says, we're going to have election day voting only, and it's going to be from 9 to 5. And there's plenty of evidence on the record that voters of one races are 10 times more likely to work a job that wouldn't allow them to vote during that time period. Is that system equally open? Seems like it, because that would be pretty much the status quo in 1982. And, of course, if it was 8 to 7, you could make the same argument about- How about 9 to 3? I think any time you diminish from what I will call the usual burdens, if you went to 15 minutes, to use an extreme example, then obviously you're effectively denying- So 9 to 5 is okay, but 10 to 4 would not be okay? Is that the idea? Again, these are all hypotheticals that have never existed in the real world. This doesn't seem so fanciful to me. 9 to 5 is okay, 10 to 3 is not. Is that the idea? Again, it's a sliding scale, and I think the farther you get from the normal hours that were etched in in 1982, the much more specific it becomes. If you want to- Thank you for your time. Justice Gorsuch? Good morning, Mr. Carvin. I'd like to return to some questions Justice Thomas touched on. What is the relationship between your test focused on opportunities and the test-the Solicitor General's brief, at least-suggested about causation and the need for maybe a proximate causation test? Yeah, at the end of the day, I don't know that there's really any difference. Their first step is do minorities have the ability to vote, and they say that's synonymous with equal opportunity. So I think we're on the same page there. They also say if socioeconomic factors lead to underutilization by minorities, that's not a cognizable factor under Section 2 because it's got to be the voting practice that causes the diminished opportunity. Again, we are in full-throated agreement with that provision as well. So the two key points are the system itself needs to provide less opportunity to voters, and if socioeconomic factors, which are external to the voting practice, lead to diminished utilization under-now, there are tests, nor the Solicitor General test, would there be a problem under Section 2? Is there anything in the Solicitor General's brief that you disagree with? I don't know why they used the word ability instead of opportunity, because one's in the statute and one's not. But other than that semantic level, no. We've also talked about reading justification into the statute, a result which I warmly embrace. We may be a tad more skeptical about whether that flows from the statutory language than the Solicitor General was. But no, we have no real disagreements with the Solicitor General, the one that was withdrawn. All right. And then the other question Justice Thomas touched on that I want to dig down a little bit further on is you speak of equality of opportunity. Does that permit any de minimis distinctions, or does it require equality of opportunity under all circumstances? Right. Yes. Obviously, any of these phrases need to take into account the sort of demographic realities, for example, that Justice Kagan was discussing. And if a polling place was a foot farther away for minorities than for non-minorities, I don't think anybody could argue that that really has a cognizable effect on opportunity. So, sure, in all of these tests, there's some kind of basic common-sense definition. Okay. And then to add one more hypothetical to this, well, maybe I'll just stop there. Thank you, Mr. Carbon. Justice Kavanaugh? Thank you, Chief Justice, and good morning, Mr. Carbon. Your brief says, quote, ordinary race-neutral regulations of the time, place, and manner of voting do not violate Section 2, end quote. And that, of course, will put a lot of pressure on the word ordinary. Can you tell us how courts are supposed to distinguish ordinary regulations from extraordinary regulations? Well, I think the way the court has done it countless times in the Anderson-Burdick line of cases and in Crawford, what are the usual burdens of voting? This is not some mystery. We have a long history about how people go about voting. They show up in precincts and they cast a ballot. That requires you to leave your house, but that's not an ordinary burden of vote. That's an usual burden of voting. Whereas the other side says you can never have a system which requires anybody to leave their house. They claim that they can't find the precincts because of socioeconomic disparities. They claim that they can't get to mailboxes because of socioeconomic disparities, which means that the state needs to allow partisan operatives to go collect the ballots. Well, if that's true, of course, that means that the only system that would satisfy their test is something where the government is sent house to house to collect the ballots. And I'm just saying that that can't come with any rational definition of the usual burdens of voting, which is you register and you go cast your ballot. And that is not a very difficult burden, and it's certainly not a difficult burden here when 99.8% of minorities were able to find the right precinct. You said in response to Justice Kagan that the tests can take account of demographic realities. How exactly under your test does that occur? Well, the precise hypothetical is populations, right? Do they provide precincts that are analogous for minorities and non-minorities? And you can't engage in a formalistic view, well, we put one precinct here and one precinct there, therefore that's equal. Again, if there's huge population disparities in terms of whom the precincts are serving, then that would not be a realistic equal opportunity. If you have ten times the population, then roughly eight to ten more precincts would need to be provided. You referred to common sense, and I think two factors among others, but two factors that as a matter of common sense, as I think about it, would trigger more suspicion. One factor would be if you're changing to a new rule that puts minorities in a worse position than they were under the old rule. And a second factor would be whether a rule is commonplace in other states that do not have a similar history of racial discrimination. Do those two considerations matter under your view of Section 2? Not really, and I think the court is cautioned. I'm not saying that you couldn't look at it, but no, the court is cautioned in terms of the retrogression point, that that is an analysis under Section 5, not under Section 2. And if you think about it, there's a common sense reason for that. If one party takes power and expands the vote dramatically without concern for ballot integrity or security, and then the other party comes in and wants to reemphasize the notion of secure ballots, they would somehow be hamstrung by whatever the predecessor group did. Justice Barrett? Mr. Carvin, I want to make sure that I understand your position because it strikes me that it has some contradictions in it. So as I understood from your brief, your position is that Section 2 does not apply to the how, to the time, place, and manner restrictions as long as they're facially neutral, and it's only about the who. Am I right about that? Qualifications would deny people the opportunity to vote. Time, place, and manner do not deny anybody the opportunity to vote. They're simply providing opportunities. Okay, but then I don't understand why you conceded in your examples to Justice Kagan that some of those time, place, and manner restrictions, like time, place, and manner, you can only vote at a country club, or time, place, and manner, you know, this is the placement of the polls, and they're going to be placed in areas that are burdensome to minorities. Aren't those time, place, and manner restrictions? But they're not neutral. In other words, because they don't give minorities the same opportunity to access the precincts as is given to whites. In other words, if you put all of your precincts at country clubs, the notion that minorities have the same opportunity to vote is laughable. So, no, no one is arguing for an unrealistic opportunity in terms of what the state has provided. I don't really think, excuse me for interrupting, but the relevant distinction here is between those that regulate who and those that regulate time, place, and manner. Really, the pressure under your interpretation is looking at opportunity and what opportunity means. I don't see why time, place, and manner really bears, you know, carries a lot of weight in your analysis. Can you explain to me why I'm wrong? Well, I just want to make it clear. If a facially neutral literacy test denies you the opportunity to vote, then we would think, since the state has now erected a barrier to voting, you would need to look at the racial composition of who the literacy test applies to, because they've denied you an opportunity. They've stopped you from voting. If the state has not stopped you from voting and the electoral system doesn't skew how you can vote, then you haven't established the threshold requirement to look at the disproportionate outcome. In other words, the state has not done anything wrong. In a time, place, or manner case, if you ask, why didn't this person vote, the answer in the literacy test would be because the state told them not to. Okay, Mr. Carvin, let me move on to a different question. I'm interested in knowing why the RNC is in the case. So, you know, the DNC had standing, and the district court said that it had standing to challenge the out-of-precinct policy because the policy placed a greater imperative on Democratic organizations to educate their voters and because the policy harmed its members who would have voted out-of-precinct. What's the interest of the Arizona RNC here in keeping, say, the out-of-precinct voter ballot disqualification rules on the books? Because it puts us at a competitive disadvantage relative to Democrats. Politics is a zero-sum game, and every extra vote they get through unlawful interpretations of Section 2 hurts us. It's the difference between winning an election 50 to 49 and losing an election 50 to 50. Okay, thank you. My time is up. A minute to wrap up, Mr. Carvin? Yes, thank you, Mr. Chief Justice. The court has a stark choice between two systems here. Ours is clear, we think derived directly from the text, and is easy to apply. Theirs is one that requires the courts to engage in a maximization policy, which anything that has a disproportionate result is somehow taken out of the hands of state legislatures. If you go down that path, even if you try and limit it by suggesting that the state can justify it or that we'll examine socioeconomic factors, that still gets the courts involved in an amorphous, manipulable situation where no one knows what the rules are going into the next election, and they'll all be decided on an ad hoc basis in a hyper-partisan environment. So in addition to the fact that our test is the only one that comports with the text of Section 2 and the Constitution, it's also the only one that gives lower courts the clarity that is especially important in the voting context. Thank you, Mr. Carvin. Mr. Brnovich? Mr. Chief Justice, and may it please the court, public servants have no more sacred duty than protecting the people's right to vote while maintaining confidence in the integrity of election results, this case before the court establishing a clear and constitutional test that allows states to meet these imperatives. A Section 2 vote denial claim requires substantial disparate impact that is also caused by the challenge law. The laws at issue here are valid under that test. They are also common sense and commonplace. Requiring in-person voters to cast their ballot at assigned precincts ensures that they can vote in local races and helps officials monitor for fraud. Restricting early ballot collections by third parties, including political operatives, protects against voter coercion and preserves ballot secrecy. Arizona urges this court to adopt a clear and workable test for vote denial claims that allow states to properly regulate their elections. I would be happy to take questions. Thank you, General. Your approach requires that the burden at issue be substantial, the disparate impact, as you just said. Where do you get that in the statutory language? Chief Justice Roberts, it's for the same reasons that the Seventh, Fourth, and Sixth Circuits have adopted this requirement. Section 2 prohibits state voting practices only when they result in minorities having less opportunity to vote and to elect representatives of their choice. Any sort of insubstantial dispatch cannot clearly meet these thresholds. What if the provision results in a 1% decline in participation by minority voters? Is that substantial enough? I mean, 1%, according to the statistical analysis, has been denied the opportunity to vote. Is that substantial? Chief Justice Roberts, we believe that our test is the most workable because if you look at what a substantial impact would be, we must analyze that under a totality of circumstances. And it has to rise to the level of a denial or an abridgment of the right to vote and the opportunity to participate and elect candidates of their choice because the whole point of Section 2 is to suss out just intentional discrimination when it's used as a proxy or a guide. So I believe that if this court looks at even the redistricting cases, such as Harris v. IRC, at that point, the court determined that 10% was something that was a substantial number. I'm sorry, counsel. When you're looking at the impact, do you look at alternative procedures? In other words, let's say there's a significant impact on minorities voting at the polls. In analyzing that, do you say, well, they can vote by mail, so overall it's not that substantial an impact? Yes, Chief Justice. We believe that in Arizona there are numerous ways that people can vote. There's no excuse to absentee balloting. They can vote by mail. We have voting centers in some counties. They can vote early, up to 27 days before the election. And so the only way to determine whether there's a substantial impact is to look at the totality of the election. Thank you. Thank you, counsel. Justice Thomas? Thank you, Mr. Chief Justice. General, there's been some disagreement as to your standing in this case. Would you take a minute to discuss why you have standing here? Justice Thomas, first and foremost, the Ninth Circuit allowed us to intervene on behalf of the state. As the Attorney General for the state of Arizona, Title 41 in Arizona statutes clearly allows the Attorney General to represent the state in federal court. There was the theory that the Ninth Circuit used to discuss some questionable legislative intent involved in the Arizona legislation was the cat's paw theory. One, I'd like you to address that, but I'd also like you to tell us to discuss how you would determine the intent of the Arizona legislature in passing this legislation. Justice Thomas, we believe that the cat's paw doctrine is completely inapplicable to a case like that. That doctrine arose out of the context of agency relationships, and it imputes the motives for superiors to the agents. But as this court knows and has recognized in the past, that you cannot impute a motive to one legislator to a group of 90 independent co-equal actors spread across two houses in the legislature. So this is no different, I believe, than the court's prior recognition that what motivates one legislator to speak out or vote for a bill is not necessarily what motivates other legislators to vote for that bill. At the end of the day, as we've articulated in our test, we believe it's the true-wrong test, and it's designed to make sure and determine whether an intentional discrimination is done by proxy. And that's why we need to look at the substantial disparity, looking at the totality of circumstances, and to analyze whether that caused that difference in voting. Justice Breyer? I'm curious to know what you think of Professor Stephanopoulos' test. My reason is simply this. It seems to me that in many discrimination statutes, anti-discrimination, Title VII, Title VI, the Housing Act, the age discrimination, essentially the courts have come down in disparate impact situations to three elements. First, the plaintiff has to show that there's some kind of significant disparity. Second, the plaintiff has to show that there is at least a but-for cause, and the states of the employer's policy is the but-for cause. And then third, the defendant can come back and show, well, we have a good non-race-related reason for this, and it can't be accomplished easily in other ways. Those three elements run through the law. Many of the tests, and Stephanopoulos, who says it explicitly, embody those three elements. Are you against our saying? Those same three elements, fitting them into the statutory language here, are the basis of a cause. We'll never get it perfect. It will always be case by case. It will always involve all the circumstances, but those are the three key elements. Justice Breyer, that's an interesting test, but I think at the end of the day, Congress didn't require that. We do believe that to adopt those tests from the Title VII context would actually shift the burden, and the text of Section 2 doesn't require it. Once again, I believe that analyzing any of these burdens on voters or if there's statistical disparities, we have to look at the totality of the circumstances and a totality of the voting systems within that state. Once again, if you look at all the opportunities that people have to vote, regardless of who they are and their background, Arizona provides a plethora of options for people to exercise their franchise. Justice Alito? Can I ask you something about the statistics regarding out-of-precinct voting? Do they refer only to voters who cast their ballots at a polling place on Election Day, or do they also include voters who voted early? Justice Alito, Mark Twain famously said that there are three types of lies, lies, damn lies, and statistics. We believe that the Ninth Circuit cherry-picked some of those statistics, because if you look at the overall totality of people that voted in Arizona, we're talking about a tenth of a percent, essentially, that may have been affected by the rules relating to in-precinct voting. At the end of the day, of the month and year, of 2 million votes cast, only about 4,000 people voted out-of-precinct. So, to simply answer your question, that only included day-of voting. It did not include the 80% of people that voted early by mail. So, what would happen if someone showed up for early voting and went to the wrong precinct? Justice Alito, they would be told that they are voting in the wrong precinct, and they would be told where to go to vote. If they insisted on voting in that precinct, they would be given a provisional ballot, but they'd be told that that ballot may not count. And this would apply to early voting as well as Election Day voting. That was the question I was getting at. I'm sorry, Justice Alito. All ballots are available at early voting centers, but not every county in Arizona has voting centers, if I understand your question correctly. Okay, let me go on to another point. You say we should give some teeth to the requirement that challengers must show not only that a protected class has less opportunity to participate in the political process, but also less opportunity to elect representatives of their choice. What would that look like in practice? Does it require pointing to a very close election on a particular day? Justice Alito, under our test, it would require looking at both of those prongs. So, first, there would have to be determination made by the plaintiffs, who would have the burden to prove, to show that there is a substantial disparate impact on the ability of minorities voters' ability to participate and elect candidates of their choice. Justice Sotomayor? Thank you. Thank you. My time is up. Justice Sotomayor? Counsel, you said that the general test under Title VII and other civil rights statutes in response to Justice Breyer puts the burden on the state. But the only burden that that test requires is for the state to justify its practice, to explain why. Why is that a burden that you can't meet? Well, the text of Section 2 doesn't require it. What Section 2 of Section 2... I'm sorry, Counsel. By your own admission, the test under Voting Rights 2 is a totality of the circumstances test. And isn't justification one of the circumstances that the Senate report pointed to? Justice Sotomayor, but the burden would be on the plaintiffs to establish that. Under our test, the plaintiffs would have to come forward... Counsel, the test requires an examination of the totality of the circumstances. Can you seriously argue that the reason for why you did something isn't part of that test? Well, first and foremost, I believe we looked into the text of the statute itself to determine how it should be interpreted in force. Counsel, the statute talks about totality of circumstances. I'm asking you a simple question. Are you arguing that the reason you did something is not part of that totality of circumstances? Twofold. One is, as I mentioned earlier... Counsel, why is that question so hard to answer? Yes or no? Is the reason why the state has picked a particular practice an important part of the totality of the circumstances test? Yes. Thank you, Counsel. Justice Kagan? Tim Rabernovich, would you have answered my hypotheticals the same way that Mr. Carvin did? No. What would be different? Well, I think that our test would require looking, first and foremost, at whether there was a substantial disparity, and then two... I'm just asking, which hypotheticals would be different? Which ones would you have answered differently? All three of them. I mean, yeah, I think all three of them would require that analysis. For example... I'm asking really about... If you could stop for a second. I just want to know what the answers are. Mr. Carvin said both polling place hypotheticals would be impermissible. Are they impermissible? Justice, it would depend on the evidence that was presented at trial. I just gave you the evidence. I just gave you the evidence, General. The evidence is 10 times more wait times, 10 times fewer votes for blacks than whites. That's the evidence. Under our analysis, so you would look at whether there was a substantial disparity. In that situation, what percentage of, for example, African-American voters were voting less than white voters? In general, the hypothetical is the hypothetical. It's 10 times the impact, right? 10 times a greater distance to the polls. 10 times more polling stations. Justice Kagan, I'm not trying to be difficult, but it really depends on the magnitude. Are we talking about one person versus 10 people? 100 people versus 1,000 people? We're talking about 1,000 people. Is that burden... Does that cause someone to not be allowed to elect the representative of their choice? Okay, how about hours? How about hours, General? How about hours? 10 to 2. Same answer. It depends on the circumstances and how that impacts. Does that have a substantial impact on the ability of the minorities to participate? Yes, it does have a substantial impact, General. If it's 10 to 2, people who work in 10 to 2 and don't have cars. And the impact has been shown to be that black voters will be very disproportionately impacted by hours that are 10 to 2. Justice Kagan, in that hypothetical, it very well could be a violation of Section 2. At that point, I believe it would be... We moved on to the second part of that, and we'd look at causation and whether the challenge law did indeed cause that. Thank you, General. Justice Gorsuch? Justice Gorsuch. Go ahead and finish your answer, Counsel, please. Thank you, Justice Gorsuch. Once again, both of these problems, we have to look at the totality of circumstances. And so even with voting hours, the question becomes, well, what are the alternative methods or ways for people to vote? How many people actually are affected by that 10 to 2 voting, those hours? So we have before us two actual voting practices, the in-precinct requirement and the rule against vote collection or harvesting. Can you explain in succinctly your thoughts on why those don't count as substantial burdens? Justice Gorsuch, after a 10-day trial, Federal District Judge Reyes found both of these statutes constitutional. Additionally, the states, when it comes to time, place, and manner, when it comes to regulations that are designed to uphold the integrity of the election process, I think the court should be very skeptical when it overturns any sort of state election statutes based on some sort of statistical anomalies. Okay, but what do you say about what you call the statistical anomalies, but the other side would call proof? Why don't they rise to the level of a substantial burden? As the district court found, there was no burden on the ability to vote. And literally, we're talking, for example, we had a precinct voting of about 4,000 ballots of more than 2 million cast. No one was denied the opportunity. And if we look at these statistical anomalies, those slight statistical differences, we have to look at that in the context of the totality of our voting system. Once again, Arizona provides early voting. People can vote at voting centers. They can vote 27 days before the election. There's no excuse for absentee balloting. 80% of people in Arizona vote by mail. So there are a whole plethora of options and ways for people to exercise the right to franchise. And so just what the Ninth Circuit did is they took a small number, as the Justice Lito referred to, of people that actually voted day of and then tried to extrapolate that, somehow, that Arizona's laws were racist or unconstitutional. Thank you. Justice Kavanaugh? Thank you, Chief Justice. Counsel, you acknowledged several times that the totality of the circumstances are relevant here. And, of course, that's in the statutory text, as my colleagues have pointed out. Is the availability of alternatives that could serve your policy goals a circumstance that matters when we consider the totality of the circumstances? Yes, absolutely, Justice Kavanaugh. And so if there's an alternative available that would serve the policy objective without causing the disproportionate impact or would cause less of a disproportionate impact, do you have to go with that? And if not, why not? Yes, Justice Gorsuch, that is in the law. And we believe that causation also plays an important role. And the totality, we look at that not only on the substantial impact but also on the causation because that causation plays an important role in connecting the totality of the circumstances with the integrity measures. So there may be multiple or there could be isolated instances of disparity, and those can be remedied without upsetting a race-neutral election integrity law. And that would obviously be strongly preferred. Thank you. Justice Barrett? So, General, one of the disputes in this case is about whether we look at the electoral system as a whole or whether we look at the challenge regulation and isolation or, let's say, on a regulation-by-regulation basis. And I want to give you this point or this example that's in Secretary Hobbs' brief. She makes a pretty good point. She says, in response to your argument that we have to look at the process itself, to say overall is the process, you know, open enough for disadvantaged voters. So, you know, even if they can't send their ballot in via ballot collection, they have many other opportunities to do so, early voting, et cetera. She points out in footnote 6 on page 23 that if a state sends unsolicited ballot applications to residents of white neighborhoods but not to residents of black neighborhoods,  and she's, you know, quoting the Republican Party there, wouldn't that be true even if black voters could vote in other ways? In other words, reducing an opportunity is reducing an opportunity in the text of the statute, even if there are still other avenues open to the black voters. Justice Barrett, in the hypothetical example you provided, that would seem to be unconstitutional on its face because it's not facially neutral. Okay, but isn't, you know, we might disagree about that, but let's say that, you know, some of Justice Kagan's examples, which seemed on their face to be sensibly neutral, on their face, time, place, and manner restrictions, if it takes one opportunity away, I guess they still don't understand why that isn't reducing the ability of those voters to vote relative to other white voters that don't share that same burden. Once again, if we focus too much on de minimis or small statistical disparities, I believe we run into grounds where then the statute itself would run afoul of the 14th, 15th amendments. So that's why if we take a step back and we analyze it with our test, looking at, one, the substantial disparate impact, the total fatality of circumstances. Okay, thank you, General. I'm out of time. Take a minute to wrap up, General Brnovich. Thank you, Chief Justice. Arizona endorses without qualification the Voting Rights Act's goal of ending racial discrimination in voting. The Constitution demands that all Americans be free from this pernicious evil. A disparate impact on minority voters can be an appropriate proxy for legal discrimination when that disparity is substantial. Without these showings, Section 2 would exceed Congress's powers to enforce the Reconstruction Amendments and properly inject race into all voting laws and impede a state's ability to run their elections. Arizona's requirements that ballots be cast at assigned local precincts and its restrictions on ballot harvesting are appropriate election integrity measures that do not create any disparate impact on racial minorities but serve us all equally well. The desire to enhance the convenience of voting must never outweigh the imperative of securing the integrity of the results. We urge this Court to reverse its instructions and enter judgment for the state. Thank you, Counsel. Ms. Amundson? Good morning, Mr. Chief Justice, and may it please the Court. When an eligible voter casts a ballot and that ballot is discarded rather than counted, that voter has been denied the right to vote. Likewise, when an eligible voter relies on ballot collection to vote and that practice is criminalized, that citizen's vote to write has at the very least been abridged. The question, then, is whether that denial or abridgment has occurred on account of race. Section 2's plain text tells courts how to answer that question, and the statutory command to answer based on the totality of circumstances necessarily requires rejection of the inflexible rules petitioners advocate. To the contrary, it mandates what this Court has called a searching practical evaluation of the past and present reality and a functional view of the political process. Petitioners have caricatured the Section 2 results test as resting on bare statistical disparities that will call into question every election regulation in the country. Not true. Section 2's results test has been in place for almost 40 years and nothing like what petitioners claim has come to pass. Indeed, successful Section 2 challenges to statewide election laws involving voter ID, early voting, ballot collection, and out-of-precinct voting number in the single digits. Section 2 liability has been limited to policies that, due to their interaction with particular facts on the ground, are outliers in the discriminatory burdens they impose on minority voters. That is the case here. As Arizona's Chief Elections Officer, Secretary of State Hobbs, knows that the out-of-precinct policy and the ballot collection statute impose discriminatory burdens on Native American, Latino, and Black voters that are not justified by any legitimate state interest. We therefore ask this Court to affirm the judgment below, and I welcome the Court's questions. Counsel, you're aware of what the Carter-Baker Commission found about ballot harvesting. They said that absentee ballots are the largest source of potential voter fraud. They said citizens who vote at home, at nursing homes, at the workplace, or church, are more susceptible to pressure or to intimidation, and that they recommended that the practice of allowing candidates or party workers to pick up and deliver absentee ballots should be eliminated. You disagree with that in this case, right, given your position on ballot harvesting? In this case, Your Honor, and that is the important distinction here, states can have an interest in securing their elections through limiting ballot collection, but when you look at the particular fact here, that does not appear to have been Arizona's interest. And in McCutcheon, for example, Your Honor, the Court noted that where, as here, a legislature takes a prophylaxis upon prophylaxis approach, the Court should be particularly diligent in scrutinizing the law. So the law is, you would strike down because there's not racial proportionality in enforcing the law, and that means that your pursuit of racial proportionality would require you to keep in place the pressure, the intimidation that caused President Carter and Secretary Baker to recommend that that harvesting practice be eliminated. Your Honor, it has nothing to do with racial proportionality. What it has to do with are the burdens that the law actually imposes on voters here. So there are particular facts and circumstances in Arizona that may not be present in other states. Well, but when you say it doesn't involve racial proportionality, you say if the burdens were equally distributed among the races, that issue, that policy wouldn't be before us, would it? Your Honor, what I'm saying is that here what we have is a record that shows that Native Americans and Latinos in Arizona rely disproportionately on ballot collection and white voters do not. So that is why this is before you. So, for example, as the District Court found, voting on Native American reservations is an activity that requires the active participation. No, no, I understand your position, which is that if there isn't racial proportionality, then the law should be struck down. I'm just asking you if that requires you to tolerate the difficulties and problems and pressures that President Carter and Secretary Baker outlined in their report. Your Honor, I am simply saying that while states can have an interest in securing absentee ballots and in limiting ballot collection, that is not the interest here. And I think the legislative history shows that, in fact, what Arizona was acting to do was to limit the participation of Hispanics and Native Americans in particular. Thank you, Counsel. Justice Thomas? Thank you, Mr. Chief Justice. Ms. Thompson, is the out-of-precinct policy still in place? It is, Your Honor. And the Secretary of State plans to enforce it? The out-of-precinct policy is part of the Election Procedures Manual that is by statute in place until at least the end of this year. So, yes, the out-of-precinct policy was enforced in the 2020 election. Okay. What percentage of the minority voters in the state of Arizona are affected by the out-of-precinct policy or were adversely affected as well as the ballot collection policies? As for the out-of-precinct policy, the record showed that minority voters were affected at a rate of 2 to 1 as to the out-of-precinct policy. I understand what you're saying there, but what percentage of the minorities who cast ballots in the state of Arizona were affected by the policies? It was less than 1%, Your Honor. However, Your Honor, this court has never held, and in fact the text of Section 2 says that it is about the right of any voter to be abridged. Of course we recognize that the number of voters affected may affect how a plaintiff can prove that a policy denied or abridged the right to vote on account of race, but it is not the case that simply a small number of voters being affected by the policy is enough to render it immune from Section 2 liability, as the United States also agreed both in its brief below and in its brief in this case. You know, I often wonder when we say there's an additional burden, Arizona's a big state and it's quite rural. I'm sure there are some people in very rural parts of Arizona who are quite burdened by the distance they have to travel in order to vote. How do you compare someone who is supposedly burdened or allegedly burdened by the out-of-precinct policy to a person like that? Well, Your Honor, that's exactly our point here is that, for example, with respect to Native American voters who have to vote, who rely on ballot collection to vote, simply saying that those voters can go ahead and vote in person or go ahead and vote by mail when they don't actually have home mail service or access to postal facilities, that's exactly the contrast that we draw with Mr. Carbon's position that it's all just about opportunity. Instead, you have to actually look at the reality of how the burden is affecting voters on the ground under the totality of circumstances inquiry. Thank you. Justice Breyer? Well, I have two related questions and both are about standards, which I think is the main issue here. What do you think of, since disparate impact is this is not the only field in which it comes up, that we take the standards from the other areas, employment, age, and housing, and so forth, and simply say they're roughly the same here? The statute does speak on account of race, which means if it's justified, it's not on account of race. All right? So we simply take those standards, producing a uniformity in the law. That's my general question. My specific question is what do you really say about the question that I think Justice Thomas was asking? If you wean in the details here, in the majority of states, they won't be able to engage in precinct voting because a lot of the precincts will turn out to be maybe 10 feet or maybe 100 yards or maybe 1,000 yards or, in general, further away from a minority group of houses than a majority group of houses. Are you supposed to go out with a tape measure? What? All right. That's a concern in the specific case. I'm interested in both. One, what's your general view of using roughly the same standards? And two, what about that specific case? First, Your Honor, as to the disparate impact standard, we think that those elements are already incorporated in the test that the court applied below, and our only quibble with the standard that Your Honor set forth is the requirement of a, quote, significant disparity. We don't think that simply importing a textual adjective like significant or substantial really moves the ball. That said, we do recognize that the size of a disparity will matter for purposes of being able to prove whether a policy is, in fact, discriminatory on account of race. As to Your Honor's second question about whether states can still engage in precinct-based voting, certainly, Your Honor, states maintain plenty of discretion and authority to regulate their elections as they see fit and to have precinct-based voting systems. The reality is that is actually not what is happening in Arizona. In fact, in 2020, 75% of voters voted in counties that do not actually use precinct-based systems. And so while there may be some interest in maintaining precinct-based systems in other states, that is not actually the reality on the ground in Arizona. We don't think that states need to take out tape measures. Instead, what they have to do is ensure that they are not providing less opportunity to minorities. So they do have to be conscious of ensuring that, in fact, opportunities are equalized across the races, and that is what Section 2 is meant to do. Thank you. Justice Alito? Counsel, I want to try to give you a couple of examples and ask you for each one to assume that a title, a Section 2 plaintiff is able to show statistical disparities that are at least as great as those that were shown here with respect to out-of-precinct voting and that those disparities were caused or but-for caused by the same socioeconomic factors that you say were the but-for causes here. So the first example is a state that has the early voting period begin two weeks before Election Day, and the plaintiffs say, and they show that it should have been 60 days, and there's the same kind of statistical disparities. Your Honor, if I may ask in your hypothetical, the plaintiffs want to go from 14 to 60 days,  No, they want to go from 14 to 60. A lot of minority voters are unable. They don't vote within the 14-day period to the same extent as they would within the 60-day period. Well, Your Honor, we think that there is a difference both in text and in precedent in asking a state to adopt a new policy versus a state taking away a policy that already exists. And so I don't think that Section 2 plaintiffs could come in and say that you are required to expand from 14 to 60, and that's because the text actually talks about the challenged standard practice or procedure in the state or political subcommittee. All right. How about a rule, the state has a rule that you have to fill in a little box to vote for a candidate, but it can be shown that there's a statistical disparity with respect to voters who don't actually fill in the box, but they make a checkmark beside the box. Your Honor, again, I think that what Section 2 calls for and what this Court has said is a practical evaluation of the past and present reality. I just want to be clear. Statistical disparities alone are not enough to make out a Section 2 violation. You would have to show that it is, in fact, imposing a discriminatory burden on minority voters, that it is not imposing on nonvoters. Well, I don't really see the difference between them. Let me give you one more example. The state has a rule that says that mail-in ballots have to be received within three days after election day, and a Section 2 plaintiff says it should be one week, and they show the same kind of statistical disparities. And, again, Your Honor, my answer is the same. Statistical disparities alone are not enough. You have to take a functional view of the political process and look to a holistic view of how it is actually affecting the voter on the ground. Those are a lot of words. I really don't understand what they mean, but I'm out of time. Thanks. Justice Sotomayor? Counsel, I'd like to return to a question that Justice Thomas asked. None of you, I don't believe, but more generally, which is, how do you prove that a legislature acted with discriminatory intent, assuming, as we must, that the legislature is made up of individuals? And so if you show only two or three of them have a discriminatory intent, how can you assume that the others do? Well, Your Honor, as this court has held in Arlington Heights and in the cases applying it, what the plaintiffs must do is show that discriminatory intent was a motivating factor for the legislation. And here I think the record was abundantly clear, in fact, much more clear than it normally is in such cases, that discriminatory intent was a motivating factor, in that the entire purpose of introducing the law by Senator Schueter was to attempt to keep Hispanics in his district from voting and was premised on far-fetched, racially-tinged allegations that Latinos in the district were engaging in fraud with respect to ballot collection. Do you know whether, can you remind me, whether the district court found that absent those two legislative motives, this law would not have passed? The Chief Justice pointed out that there are independent reasons for passing the ballot collection limitations. Did the district court actually look to determine that even if this was a motivating factor, that the law would not have passed without it? Your Honor, the district court, because it found it was not a motivating factor, did not reach that question, but as the on-bounds court held, clearly discriminatory intent was a motivating factor and it used the district court's own fact findings. The district court simply minimized the importance of those findings. They do show that discriminatory intent was a motivating factor and certainly the state did not meet its burden to show that the law would have been enacted absent that. Thank you, Counsel. Justice Kagan? Ms. Amundson, the longer this argument goes on, the less clear I am as to how the party's standards differ. So if I understood what Mr. Carvin said at argument, as opposed to what he said in his brief, he said of course you should look at demographic realities. He even said, you know, it would be laughable not to look at demographic realities on occasion. And I bring you back to this hypothetical question where black voters have many fewer polling stations, even though that's a completely neutral rule on its face, but the way it operates is to make voting more difficult for black voters than white voters and leave it so that the political system is not equally open to their participation. And he said, sure, you can look at that. And similarly, you talked about, like, the practical evaluation of realities on the ground. So, I mean, tell me how you think these things differ. And I guess more specifically, I guess when you start thinking about a whole run of hypotheticals, there are some things that are really quite obvious burdens, which you just know looking at them is going to lead to real difficulty for some, you know, for black voters or for Native American voters or for Latino voters. And then other restrictions where you can say, well, you know, that's kind of an inconvenience. But they could overcome that inconvenience if they really wanted to. So how is... I guess what I'm saying is there's a spectrum of restrictions and a spectrum of the effects that those restrictions cause. How are we to think about that? Well, Your Honor, as to Mr. Carvin's concession that the court needs to look to demographic realities, I find myself in agreement with him on that. And as the court has said in its jingles and in its vote dilution jurisprudence, the essence of a Section 2 claim is looking to how the state's practice interacts with social and historical conditions to cause the inequality. And so, Your Honor, as to the kind of spectrum of regulations, that's exactly what Section 2 is meant for courts to do, to undertake a functional inquiry into the totality of the circumstances. What I took Mr. Carvin's brief to be saying, as opposed to what Mr. Carvin argued here today, is that, in fact, so-called neutral time, place, and manner regulations don't even implicate Section 2. That is, you don't even get to get past the pleading stage if you come in and say this is simply a neutral time, place, and manner restriction. Instead, what courts should be doing is looking at how that restriction interacts with the facts on the ground to see whether it is, in fact, causing a discriminatory burden on minority voters. And here, that's what the court did and, in fact, found that the out-of-precinct policy and the ballot collection law impose discriminatory burdens that are not justified by any legitimate state interest. Thank you, Ms. Amundson. Justice Gorsuch. Good morning, Ms. Amundson. Would the state agree that, or would the Secretary of State agree that Arizona could have a law saying we will not count fraudulent ballots? In fact, Arizona does have such a law, Your Honor, yes. Okay. If that's the case, can the state also have some laws that try to prevent fraud in balloting? Certainly, Your Honor. States have an interest in preventing fraud in balloting, but as this court has recognized in its campaign finance jurisprudence, when it is acting to prevent fraud in balloting, a state must actually have record evidence that there is, in fact, the danger that it is acting to prevent. Here there was no such thing. Okay, so let's take the harvesting one, for example. The district court found that there was evidence available. The Chief Justice has referred to the Carter-Baker Commission, and there was also evidence, I believe, in the record of harvesting affecting fraudulent practices, harvesting affecting at least one election elsewhere. What about that is insufficient? Your Honor, with respect, there was no such evidence of there ever being any ballot collection fraud in Arizona. I didn't say Arizona. It was in another state. Does Arizona have to wait for fraud to occur in Arizona using a practice? No, Your Honor. No, Your Honor, but as this court has said in its... Okay, so it doesn't matter then. You agree it doesn't matter that their harvesting hasn't resulted in fraud in Arizona. How many states, how many elections does it need to affect out of state before Arizona can take cognizance of it in its own state? Your Honor, what this court said is that when, in McCutcheon, is that when a legislature takes a prophylactic approach, the court should be particularly diligent in scrutinizing the law, and that should be... I'm afraid that, I'm just asking, you know, how many elections? What would be enough in the Secretary's view? It doesn't have to happen in Arizona. How many states does it have to happen in? How many elections? Your Honor, to be clear, Arizona already has a law prohibiting fraudulent ballot collection. What this law does is it criminalizes neighbors helping neighbors deliver ballots. With up to two years in jail and... I guess I'm just asking a pretty simple question. You agree that some prophylactics are allowed, and that this addresses a prophylactic issue that other states have found to be problematic, and a Blue Ribbon Commission found to be problematic. How much more concretely would you require? Your Honor, what I'm saying is Arizona already has a law preventing... I understand what you've said. I'm asking how much more would you require before Arizona could do this. Are you saying it could never do this? I am saying that criminalizing non-fraudulent ballot collection simply does not get at the state's interest in preventing fraud. With respect to prophylactic restrictions, the court's inquiry should be at least as searching for restrictions on the ability to participate in the political process through voting as it is for restrictions on the political process through spending money. Thank you. Justice Kavanaugh? Thank you, Chief Justice, and good morning, Ms. Amundson. I want to explore how we got here as a statutory matter and try to square up statutory text and common sense a bit. It seems like there are two polar positions one could have reading different parts of the statute. Section 2A speaks only of results. That was the House bill, of course, and that strongly supports a position that any disproportionate impact would be problematic under the statute. Of course, the dole compromise meant that Section 2B was added to the statute, and that speaks of opportunity, and a polar position on that would be, as was suggested in Mr. Carvin's brief, that time, place, and manner restrictions that are race-neutral provide equal opportunity. But as Justice Kagan pointed out, just as Mr. Carvin alluded to demographic realities being relevant, the State Attorney General also talked about the totality of the circumstances being relevant, and, of course, in Section 2B refers to the totality of the circumstances. So to the extent we're not in either polar position, we're between pure results and pure opportunity, as defined in Mr. Carvin's brief, at least, and we're in totality of the circumstances, two circumstances that seem to make a difference as a matter of common sense. One, as the Chief Justice pointed out, when you have the Carter-Baker Commission saying that a particular state law is a good idea as a matter of policy, that would seem to be a circumstance that is, as a matter of common sense, would lend support to the State's rule. And then secondly, and I mentioned this earlier, when a state rule is commonplace in other states, that would seem to be a circumstance that puts a thumb on the scale in favor of the legitimacy of the state rule and it not being a reflection of discriminatory intent. And here the out-of-precinct policy is in something like 26 other states, including a wide variety of states, including states with no history of discrimination. So if we get into totality of the circumstances, why don't those two things matter? And you can comment more generally on how I've outlined this. Thank you, Your Honor. Taking both policies in turn, it certainly is relevant that policies are commonplace. However, it doesn't give a state a free pass just by saying this is a common policy. Instead, you have to look at whether, in fact, the policy is justified in that state. And so, for example, with the out-of-precinct policy, the state justifies it by saying that it needs to maintain a precinct-based system. But the reality in Arizona is that 75 percent of voters in the 2020 election voted in counties that do not use a precinct-based system. And so that should cause a court to question whether, in fact, such a policy is actually necessary or is, in fact, doing something else, which is disenfranchising minority voters. Second, with respect to the ballot collection statute, again, Arizona had a 25-year history of literally not a single instance of fraud with ballot collection. It already has a statute that criminalizes ballot collection. And the way that the policy will operate on the ground will be to disenfranchise Native American and Hispanic voters. Justice Barrett? That it is commonplace doesn't give the state a pass. Justice Barrett? Secretary, let's see. Sorry, I got distracted by the run on Merit. So, Ms. Amundson, I want to ask you a question about the degree of, say, inconvenience versus burden, because one of the difficulties in this case is that the Attorney General says that the burden has to be substantial. Mr. Carvin is talking about the ordinary burdens of voting. And there's a difficulty that the statutory language and its lack of clarity presents in trying to figure out when something crosses from an inconvenience to a burden. On the other side, and I think some of the hypotheticals that Justice Alito is asking you emphasize this, I think your position and its emphasis on any disparity at all risks saying that any election rule, which, as Judge Easterbrook pointed out in his frank opinion, you know, all election rules are going to make it easier for some to vote than others. So your approach risks ruling them all out. So let me give you an example. What about a rule that the polls close at 7 p.m.? And because of socioeconomic reasons, it's harder for minority voters to get to the polls before 7 p.m. because of the time of their work hours in the day. Is that the kind of burden that triggers Section 2? Would such a rule, poll closure rule, would that violate Section 2? Your Honor, no, I don't believe so. And again, though, Your Honor, you would look to the actual facts on the ground. And as I said to Justice Alito, a statistical disparity, that is not enough. Instead, you would have to see whether, in fact, on the ground, this is acting to actually cause less opportunity for minority voters. But I'm telling you it is. But because of socioeconomic conditions and the hours that minorities work, you know, that is the cause of their not being able to get to the polls during the hours that the polls are open. Well, again, Your Honor, one would have to make out a case that those minority voters had no other alternatives of voting. If one was able to do that, then, in fact... But I thought that your position was that you look at it on a regulation-by-regulation basis, not the system as a whole, so that it didn't matter if there were other alternatives. The question whether it was this alternative reduced opportunities. Your Honor, our position is that you should consider the regulations in the context of the system as a whole. However, you can't simply excuse one discriminatory practice by saying that there are others. So, for example, to say to a Native American voter who lives on a reservation 45 miles from the post office... Okay, but you're changing my hypothetical. I want you to explain why my hypothetical doesn't fail your test. Your Honor, under our test, you would have to show that the voter, in fact, has less ability to vote, that the policy is a but-for cause of that lesser ability to vote, and that you would consider the totality of the circumstances, including, in particular, the state's justification. Okay, thank you. The courts always have strong justifications in ending elections by a reasonable time. A minute to wrap up, counsel. Thank you, Your Honor. As this court has repeatedly said, no right is more precious in a democracy than the right to vote and to have that vote counted. That is what Section 2 protects. Petitioners have pejoratively called Section 2 a one-way ratchet, but in a democracy, we should actually want to ratchet up participation so that every eligible citizen who wants to vote can do so. Candidates and parties should be trying to win over voters on the basis of their ideas, not trying to remove voters from the electorate by imposing unjustified and discriminatory burdens. Unfortunately, petitioners have made clear that that is not their vision of democracy. Indeed, Mr. Carvin's clients frankly admitted to this court in their briefing that they are here because they view enforcement of the Voting Rights Act as a, quote, injury to their electoral prospects. Secretary Hobbs admits that the real injury here is to the Native American, Latino, and Black citizens of Arizona whose right to vote has been denied or abridged by the out-of-precinct policy and the criminalization of neighbors helping neighbors deliver their ballots. We ask the court to affirm the judgment below. Thank you, counsel. Mr. Spiva? Thank you, Mr. Chief Justice, and may it please the court. The Ninth Circuit applied the correct test to determine that Arizona's policy of entirely disenfranchising voters who cast out-of-precinct ballots and its criminal ban on non-fraudulent ballot collection violates Section 2 of the Voting Rights Act. The test is rooted in the plain text of Section 2, clear congressional intent, and this test, it has proven workable over many years in vote denial cases in the circuit courts. This test has resulted neither in the rejection of all manner of common-sense voting regulations nor in the impermissible consideration of race in the adoption of voting laws. Far from it. Using this test, courts have done the intensely localized analysis called for by the Act and have struck laws only with clear discriminatory effects. Applying the right test, the Ninth Circuit also reached the correct result in this case. I welcome your question. Counsel, I want to touch on an issue that Justice Sotomayor raised with your friend about legislative intent. Let's say that you have 49 legislators who speak and give good reasons for adopting, say, a law against ballot harvesting. They quote the Carter-Baker Commission. Forty-nine of the legislators don't say anything at all. And two legislators have clear racial motivation. And the law passes 80 to 20. Was race a motivating factor in that case so that the legislation would be suspect? Probably not, Your Honor, assuming that in your hypothetical that only the two were motivated by race and that did not infect any of the other members. What we have here in this record, though, Your Honor, is far from that. It is a careful application of this court's test in Arlington Heights that looked at not only Well, I thought the evidence of racial intent was really quite limited in this case. It's actually well beyond what you normally have, Your Honor. Not only did you have the pervasive influence of Senator Shooter, but also you had the LeFaro video that was widely played as the district court found and that was How much evidence did you have? Is there any evidence of other legislators other than Mr. Shooter? Well, yes, Your Honor, there was evidence that in terms of the history of the act, that a precursor bill was withdrawn when the DOJ asked for additional information, declined to preclear it until it could get additional information. Well, with respect to this legislation, the only racial motivation, I thought on the record, was Mr. Shooter, one of the legislators. No, Your Honor, that's not accurate. I think each of these prongs of the Arlington Heights test that look at the circumstantial and direct evidence that's available, there were several things that indicated a racial motivation. One was Mr. Shooter, but also there was the LeFaro video. Also, there was the sequence of events that started with the DOJ declining to preclear. Thank you, counsel. Justice Thomas? Thank you, Mr. Chief Justice, counsel. Again, the legislative intent is interesting, and I don't know how much weight we should put on it, but the Ninth Circuit did put somewhat some weight on that. I'm wondering how you would analyze that. If, in addition to what was said that was somewhat of a pejorative nature about minorities, if someone said the opposite or something similar or countervailing about whites, and you had both sets of pejoratives in the legislative history, how would you analyze that and how would it change the way you would analyze this case? I'm not sure that it would make a difference, Your Honor. I guess it would depend on what was said and what role, if any, it played in the passage of the legislation. Because, as this Court has held in Arlington Heights, determining whether racial motivation was a factor, doesn't have to be the only factor, but a factor in the passage of the Act is not simply a question of counting heads or statements. Oftentimes there are no discriminatory statements available, and yet the Court has said that the way to determine whether racial discrimination is at work as a motivating factor is to analyze the Arlington Heights factors, because often in this day and age, the circumstantial evidence of that is all that's available. Here's one of these extraordinary cases where you actually have, in addition to a wealth of circumstantial evidence, actually direct evidence of racial motivation at work. There have been some questions raised about the RNC roles or participation in this case. If there are doubts about the RNC, if those prevail, should that also undermine your standing in this case, too? No, Your Honor. The DNC and the other plaintiffs' standing rests on organizational standing principles because they have to expend resources in order to overcome the discriminatory effects of these laws. Their constituents and members are also impacted because it makes it harder, at least, and sometimes results in the denial of their vote. The RNC's standing, as I understand it from their briefing, is that if the ruling stands that more minorities who will vote for Democrats, I'm taking the view of their brief, will vote against them, and that's not a cognizable interest, a concern that more people will be able to vote because you don't like the way they're going to vote. Justice Breyer? Listen, I just appreciate your comments. You've listened to the same argument I have here, and it seems to me lots of the parties on both sides are pretty close on the standards. So you take the Title VII or these other title standards. You might have to modify it a little. I think you do have to use the word significant harm because you have to, somewhere or other, get rid of this happening just by chance. Maybe you'd say it was reasonably foreseeable that minorities would be impacted negatively. And there's room there for who has the burden of proof of showing that there's a justification. And there's a question about the extent to which non-race-based tradition would count as a justification. Now, any comments you want to make are welcome. Any additions to what I'm seeing as open areas or not? Any comments? Yes, Your Honor. I think there's not a lot of daylight between what we think the statute and the legislative history in this Court's precedents require in terms of a standard and, say, the Stephanopoulos principle that Your Honor has asked about. I do think that the existing standard that has been applied in a number of cases over the last several years in vote-denial cases generally does look at the magnitude. It doesn't require it as a threshold matter, and it shouldn't. But most of the cases where plaintiffs have prevailed have actually found a significant disparity, as the Ninth Circuit found here, and that the state's interest comes into consideration under the tenuousness factor under the totality of the circumstances. That's an appropriate thing to look at and should be looked at and was looked at here. And what the Ninth Circuit found was that really the state did not have a justifiable interest in continuing these policies. Justice Alito? I think what concerns me is that your position is going to make every voting rule vulnerable to attack under Section 2 to the same extent that the out-of-precinct policy was found to violate Section 2 by the Ninth Circuit, because people who are poor and less well-educated on balance probably will find it more difficult to comply with just about every voting rule than do people who are more affluent and have had the benefit of more education. Explain to me why that is not so. Will it not be possible to show with respect to just about every voting rule that there is the kind of statistical disparity that was shown with respect to out-of-precinct voting and that the disparity was caused by the same socioeconomic factors that you would say were sufficient here? Yes, it won't result, and it hasn't resulted, Your Honor. We don't have to project. Or whether it has up to this point. This is a new area of litigation. Explain to me why it will not result in that. Well, but the standard that we support, Your Honor, has been applied in numerous cases over the last decade, and I'll give you an example. Voter ID. In the Lee v. Virginia State Board of Elections case, voter ID was upheld there because the court found that there wasn't a disparate impact because the state provided free IDs in that context. Again, using the totality of the circumstances test, came to the conclusion that voter ID in Virginia was permissible and Section 2 didn't require it being struck down. You compare that to the Fifth Circuit in Veazey. Thank you. My time is up.  Justice Sotomayor? Counsel, should there be a different burden between changing a long-established voting requirement and imposing a new one? Let's go back to the two practices at issue here. The out-of-precinct voting is not a new law. It's always been in effect. And so where is that fact considered in the totality of circumstances as you define it? And I have an easier time understanding how the ballot collection is a change in law and one in which the information provided to the legislature and the voters, a lot of it was racially changed and false, correct? That's correct, Your Honor. All right. So answer, tell me how those factors get considered in your views. Yes, I think that it is part of the consideration. I think where you're talking about adding a new method of voting that that is very different from taking away a method of voting that people have come, minority people have come to rely upon because the text speaks in terms of abridging a right to vote, i.e. a shortening less than taking something away. So I think a plaintiff would have a harder time in the general case advocating for a new rule, some of the hypotheticals about adding additional days of early voting and the like. Why don't you have the difficulty of that burden with respect to the out-of-precinct voting here? That's been around, working imperfectly, but it's been around for a long time. Right. What makes your circumstances compelling enough to justify interference? Right. And that, of course, is a standard that has resulted in the denial of the vote, and it has been around for a long time. So I think that's one difference. But secondly, I think the passage of time here cuts the other way because there may have at one time before such things as electronic poll books and the like that made it necessary perhaps to disenfranchise people if they voted in the wrong precinct. As the Secretary has stated and as the record reflects here, there is no longer any such justification for entirely disenfranchising people if they go to the wrong precinct. Justice Kagan? Mr. Spiva, you spoke with Justice Breyer about the Stephanopoulos test. I would like to ask you about the old SG test. If you look at the SG brief that was filed in this case, what do you think is right with what the SG said, and what do you think is wrong with it? Well, what I think was wrong with it, which is a little bit easier for me to answer, is that the proximate cause standard that they were advocating, which essentially as I read it was saying that you shouldn't consider the Senate factors in the totality of the circumstances, but essentially that the challenge standard of practice by itself must have caused the disparity. And I think the problem with that is that it essentially would immunize any voting rule, including literacy tests, that were not either facially or intentionally discriminatory. A literacy test does not in itself, despite what my distinguished colleague on the other side said, stop anybody from voting. If you pass the test, you can vote. Everybody has an equal opportunity on its face to pass the test. And this court actually in Lassiter v. Northampton actually said that literacy tests were okay prior to the passage of the Voting Rights Act. The problem is that because of discrimination in education and opportunity, it has a disparate impact on racial minorities. And what's right with it? What don't you disagree with? Well, I think that they maintained the position they maintained at the Ninth Circuit that there shouldn't be some arbitrary threshold requirement in the test that you show that a certain number of minorities were disenfranchised before the court proceeds to analyze under the totality of the circumstances whether it's a prohibited discriminatory result. Thank you. I think that's right. Justice Gorsuch? Good morning, Mr. Spiva. Did you have a chance to comment on the Solicitor General's causation test? What do you think of that? Well, they advocated, they of course withdrawn it, the approximate causation. And I think that that's wrong because I think but for causation is the appropriate standard. As this court said in the Bostock case, that but for causation is the appropriate standard. The law sometimes uses proximate cause and other times it uses but for cause. That was a Title VII case, this obvious Section 2 case. Any thoughts on why a proximate cause test would be inappropriate given the language of the statute? Yes, Your Honor, because the statute and the legislative history as well call for a totality of the circumstances inquiry which requires evaluating whether the standard evidence you use is one question and what test you apply that evidence against is another. So I'm not sure that explains it. What explains the need for a but for rather than a proximate cause test? What evidence do you look at? As I understand the proximate cause standard that BSG was advocating for and that petitioners still are, it would not look to any interacting factors to establish, i.e. the Senate factors, to establish the causal link between the disparate impact and race. And I think that is countertextual and would actually inappropriately limit the prohibition of Section 2 only to those circumstances where the standard was discriminatory in intent or facially discriminatory. Thank you. Justice Kavanaugh? Good morning, counsel. Section 2's language is elusive in the wake of the Dole Compromise which created murkiness because it was a compromise that generated then overwhelming support in Congress and from President Reagan. But the statute after the Dole Compromise, I think you agree, creates something of a gray area between a pure results and pure opportunity. And you look at the totality of the circumstances, several counsels said, including I think you said the Senate factors. One of those factors is, is there a good justification for these rules? And then on the ballot collection, I'm going to repeat the question. You have the Carter Baker recommendation on the out-of-precinct. You have it being commonplace in other states. That on its face, at least to me, suggests a strong justification for doing these rules. How does that weigh in the balance in your view? Well, two things, Your Honor. The Carter Baker report was not something that the legislature here considered, and even the recommendations of the Carter Baker report was not based on any evidence of ballot collection fraud anywhere in the country. The legislature, and the district court found this, had no evidence of voter fraud, not only in Arizona but anywhere in the country at the time that it passed the criminal ballot collection ban. In terms of it being commonplace in other states, I do think you have to look to the context. It is relevant, but there are also more states that actually permit some form of ballot collection than don't. And so I think what the- Out-of-precinct is common in other states, correct? 26 states? Well, but also at least 20 partially count out-of-precinct ballots. And so you have to do the intensely localized analysis, to use this court's phrase, in the jurisdiction. And when you do that in Arizona, you find that Arizona moves its precincts around a lot, that it locates them further from minority households than from white households. But there are all these factors at work in Arizona, in particular, that cause the policy to be discriminatory. Thank you, counsel. Thank you. Justice Barrett? Mr. Steeve, I want to pick up where you left off with Justice Kavanaugh. You said there were a number of factors in Arizona that caused the out-of-precinct policy to discriminate on the basis of race, including the fact that Arizona changes its precincts often. Let's assume that we adopt a but-for standard of causation as you propose. I want to ask you a question that Judge O'Scanlan raised in his dissent to the Ninth Circuit's en banc decision, which is, why isn't it the precinct system itself, rather than the policy of discounting votes, that causes the disparity? Because as you described it, it's the fact that the precincts change, the locations move around, but you've expressly disavowed any challenge to the precinct policy itself. Am I right? Well, we have challenged, to answer your question directly, the reason that we challenge and the reason it's the but-for cause, the policy of not counting the votes, is that is what causes minority groups to be disenfranchised by two-to-one. But it's not what causes them, as opposed to the ballot collection, where the argument is the inability to vote by relying on a third party actually reduces the opportunity to vote. Here, it's not the discounting of the votes. It's the inability to locate and show up at the right precinct that causes the disparity. Correct? Well, but the result, what causes the result is the fact that Arizona doesn't partially count those ballots. I don't quarrel at all with the fact that Arizona's practices contribute to that, and that was and is part of our challenge. But the claim, though, is focused on the practice that causes not only an abridgment, but actually the outright denial of the right to vote in this case. Okay. Thank you, counsel. Mr. Spiba, I'm going to have to wrap up. Thank you, Mr. Chief Justice. This court said in Shelby County that Section 2 remained as a permanent nationwide ban on voting discrimination, and the court acknowledged that voting discrimination still exists. No one doubts this. This has proven not just an accurate description of the times in 2013, but also prophetic. More voting restrictions have been enacted over the last decade than at any point since the end of Jim Crow. The last three months have seen an even greater uptick in proposed voting restrictions, many aimed squarely at the minority groups whose participation Congress intended to protect. Rigorous and fair enforcement of Section 2 is as critical to the protection of minority voting rights today as it was when Congress passed the 1982 amendments. The test used by the majority of circuits has not undermined a large swath of neutral voting restrictions. Rather, it has been used to carefully review and, where necessary, strike down discriminatory voting laws. Thank you. Mr. Carbon, rebuttal. Thank you, Mr. Chief Justice. I think the colloquy makes clear that we're the only people who are providing a clear rule that can be applied by the lower courts. To clarify any ambiguity in this, both at argument and our brief, we've been making the same argument. Does the voting system provide different opportunities to minorities than it does to non-minorities? Has the voting system stacked the deck to favor non-minorities? If it hasn't, if it doesn't treat minority neighborhoods differently than non-minority neighborhoods, then there's no problem. If it does, that's what gets at it. Now, figuring out whether there's this kind of differential treatment, you need to look at population or, stated differently, demographic reality. One precinct with five people in it is quite different than one polling place with 5,000 people in it because the latter has much less opportunity. But if there's no differential treatment of that kind, socioeconomic factors, a contribution to minorities' ability to utilize that same opportunity is irrelevant. Finally, I want to get back to the colloquy that Justice Alito was having with Mr. Spiva. Given the ubiquity of socioeconomic disparities, this would clearly put states in a straitjacket. This case brilliantly illustrates that. They claim that there's a lot of problem for minorities to get to precincts relative to non-minorities. What does Arizona do? Has this free mail system for 27 days that's utilized by 80% of the people, the very system that the DNC went around the country advocating as an expansion of the franchise. Now we're told that a mail system somehow discriminates against minorities, which is completely untrue under the facts. But the only fact you need to know is anybody whose ballot is harvested received the ballot through the mail. This is all people who've already got the ballots and they're picked up after they're voted. Well, how did they get the ballots? They received them through the mail. So for that reason, the district court was quite correct to hold that there's no connection between access to mail and the need for ballot harvesting. They couldn't produce a single voter who said it was more difficult to vote without ballot harvesting. Same thing in terms of precincts. The notion that socioeconomic disparities make it difficult to find a precinct has nothing to do with this case because everybody involved here found a precinct. They simply found the wrong precinct. So transportation and work schedules had no inhibiting effect on minorities. And finally, of course, they didn't challenge the arrangement of precincts. The court found in Joint Appendix 336, precincts are no harder to find. And indeed, the plaintiff's expert at Joint Appendix 109 said that precincts were closer to Latinos in Maricopa County than to non-minorities. Thank you. Thank you, counsel. The case is submitted.